**In re SIOUXLAND BEEF PROCESSING COMPANY, Debtor.**

**SIOUXLAND BEEF PROCESSING COMPANY, Plaintiff,**

v.

**Bernard KNIGHT, Defendant.**

**Bankruptcy No. 82–04331.
Adv. No. 83–0736S.**

United States Bankruptcy Court,
N.D. Iowa, W.D.

Oct. 7, 1985.

William L. Edmonds, Sioux City, Iowa, for plaintiff.

P.D. Furlong, Sioux City, Iowa, for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge, Sitting by Designation.

This case is before the Court on Complaint of Siouxland Beef Processing Company (SIOUXLAND) filed September 15, 1983, seeking judgment against the Defendant, Bernard Knight (KNIGHT), for the sum of $115,576.09, representing the principal plus accrued interest on a promissory note from Knight to Siouxland. Answering, Knight alleges his obligation on the note was discharged by accord and satisfaction as well as by operation of section 554.3601 of the Iowa Code (U.C.C. § 3–601(2)). Knight has counterclaimed for $151,250.00 stemming from allegedly

unpaid wages, accrued vacation pay and an unpaid bonus.

Siouxland is an Iowa company engaged in the slaughtering and fabrication of beef. It filed for protection under Chapter 11 of the Bankruptcy Code on October 1, 1982, and contemporaneous therewith filed a Plan of Reorganization. The Notice and Order for meeting of creditors was issued on November 19, 1982. The Plan of Reorganization was confirmed by Order issued July 14, 1983. Knight was not listed as a creditor in the Debtor's Schedules, nor did he file a proof of claim. In response to Siouxland's adversary Complaint on the promissory note, Knight, in his Counterclaim served October 17, 1983, and filed with the Court on October 19, 1983, asserted for the first time his claim for wages, vacation pay and bonus. Siouxland takes the position that his claim is barred by operation of the bankruptcy laws as well as by the Iowa Statute of Limitations.

The case came on for trial before the undersigned, sitting by designation, on September 11, 1985, in Sioux City, Iowa.

## FINDINGS OF FACT

The facts as relevant to a determination of the issues presented may be summarized as follows:

1.

Siouxland, in 1979 and for some time prior thereto, had been operating unsuccessfully and, in the words of its President, "needed a shot in the arm". Knight entered the picture as an acknowledged expert in the meat processing industry. He was with Iowa Beef Company for 17 years and, in September 1979, was approached by Merle Burmester, Siouxland's President, concerning possible employment with the Debtor. Knight commenced employment with Siouxland in September 1979, the exact terms of which are in dispute. There is no written contract of employment in evidence. It appears from the trial testimony that Knight asked for $100,000.00 but was offered $60,000.00 per year as a base with an understanding that the salary could be renegotiated. Knight was not hired for any specific time period but was paid on a weekly basis against the $60,000.00 per year base. In addition, he was given a company car. At trial, Knight stated that as a part of his employment consideration, he and Burmester discussed both vacation pay and a bonus, with Burmester agreeing he could take whatever vacation he had at his previous place of employment which was three weeks per year. At trial, Burmester stated that when Knight was employed, Knight advised him that he did not want vacations in weekly blocks but only wished to take weekends or days here and there. It was Burmester's understanding that Knight was not hired with vacation pay in mind despite the general company policy of according all employees a week's vacation pay after one year with the Company. In an earlier deposition, Knight stated that no discussion of any terms of employment were had other than salary. The Court concludes that Burmester's recollection is more accurate and that no specific agreement was ever reached as to Knight's right to vacation pay. With regards to the right to a bonus, Knight stated at trial that he agreed to $60,000.00 per year with Burmester's assurance that it would be renegotiated if the business showed a profit. Burmester, on the other hand, stated he never had any discussions with Knight regarding a bonus nor did they ever discuss the subject as a condition of employment. Again, in a prior deposition, Knight stated that during the employment negotiations, no other terms beyond the $60,000.00 were discussed. The Court must conclude that, at least initially, there was never any agreement to pay a bonus.

In December 1980, Knight and Burmester had a salary discussion where Knight asked for a raise to $125,000.00 per year plus 50% of the profits. Burmester, at that time, agreed to neither; but in January 1981, Knight on his own behest directed the Company's bookkeeper to increase his salary to $2,500.00 per week which she did and which was later approved by Burmester. He was then under the impression that his Company was showing some prof-

it. Knight continued to draw $2,500.00 per week until October 2, 1981. Despite his assertion that he has unpaid wages due him, on cross-examination he agreed that he had been paid for all weeks worked.

Knight premises his entitlement to a bonus upon his recollection that some time in early 1981, Burmester agreed to go along with giving him a bonus based on 40% of the profits of the fabricating division. Based upon the Company's unaudited internal income statements, Knight calculated his bonus for 1980 at $120,000.00, this being 40% of $300,000.00, a sum which he figured was the net profit of the fabricating division. The unaudited company reports depict an estimated net profit of $224,689.00 for the fabricating division for the 13-week period of September 28, 1980, to January 31, 1981, and an estimated net profit of $7,376.00 from market sales for the same 13-week period. For the five-week period of September 29, to November 1, 1980, the reports show fabrication profits of $47,428.00 and market profits of $2,771.00. For the 52-week period of November 1979 to November 1980, the reports depicted a fabrication division profit of $92,532.00 and market profits of $18,-367.00. Burmester, in later 1980 or early 1981, was suspicious of these reports and regarded them at best as only estimates. In fact, Siouxland's true financial position was quite different. John Redshaw, a CPA, rendered a company audit for the fiscal year October 1979 to November 1980, as well as preparation of the 1979 and 1980 fiscal year tax returns. The audit for the period indicated show the fabrication division as realizing a profit of $56,172.00. But, when coupled with the slaughter division, Siouxland overall suffered a net loss of $349,929.00. Overall, the Company lost $23,607.00 for the five-week period of September 29, 1980, to November 1, 1980, with only the fabrication division showing a profit of $47,428.00 during this period. The federal income tax return for the fiscal year October 1979 to November 1, 1980, reveals a net loss of $379,555.00. The federal income tax return for the fiscal year November 1, 1980, to October 31, 1981, reveals a net loss of $601,352.00. In the opinion of Redshaw, the Company lost money for the period October 1980 through January 1981. Based on the documents in evidence, the Court must agree with his assessment.

Knight bases his bonus not upon the total profit picture of the Company, but only upon that of the fabrication division which was showing a profit. The profit of that division, however, was not even close to $300,000.00 for 1980. From the audit, it had a profit of $56,172.00 through November 1, 1980. The Company's unaudited internal income statement of the fabrication division for the 13-week period of September 29, 1980, to January 31, 1981, depicting an estimated profit of $224,689.00 for that period, cannot be regarded as accurate. The income statement for fiscal year November 1, 1980, to October 31, 1981, attached to the fiscal year 1981 federal tax return, depicts gross sales from the fabrication division of $39,088,797.00 and sales of $8,465.00 from offal. The cost of sales for the same period was $39,022,123.00 which, even without deducting general expenses of $594,208.00, shows a net loss of $33,926.00 for the fiscal year 1981. The Court must conclude, from a review of the financial exhibits and the testimony of Mr. Redshaw, that the fabrication division did not make a profit except on a very short term which, overall, is completely illusionary and not an accurate reflection of the division's overall profitability. There was no profit upon which the bonus, whether agreed to or not, could be based. Further, the Court must conclude in face of the Company's true financial condition that it was unlikely that Burmester agreed to give Knight a bonus.

2.

In April 1980, the Company loaned Knight the principal sum of $55,000.00, evidenced by a promissory note signed by Knight and payable on demand to Merle Burmester or Siouxland Beef Processing Co. The note, dated April 29, 1980, carried interest at the annual rate of 20½% until paid. At trial, Knight stated that after

agreeing to a 40% bonus, Burmester concluded it was impossible and, in late January 1981, offered to cancel the note in lieu of the bonus. Knight, at trial, stated that he agreed to this. Burmester testified, however, that he never agreed to either the discharge, forgiveness or cancellation of the note. The note was never surrendered to Knight, and the obligation was listed as an asset on Siouxland's Schedule of assets as previously noted.

The note and its payment were discussed at several meetings held in July and September 1981. These meetings were attended by Knight, as recalled by Mr. Redshaw and Betty Burmester, both of whom were also in attendance. The July meeting was also attended by Jeffrey Ingals, the national credit manager for John Morrell Co. Ingals recalled that the Knight note was discussed with the understanding reached that it would be paid in January 1982. Redshaw recalled the note being discussed as well and said that at the September meeting, it was listed as a Company asset. He also recalled that at the July meeting, the note was acknowledged by Knight who said at the time that it would be paid after the first of the year. Betty Burmester recalled that at the July meeting, Knight was asked by the Company's attorney when the note could be paid and was told by Knight that it would be paid right after the first of the year. At trial, Knight did not recall the July meeting at all and, while acknowledging attendance at the September meeting, said that the note was never discussed. Knight similarly denied ever receiving a demand letter but, upon being shown a copy of a letter from Siouxland's attorney addressed to Knight dated August 23, 1983, he then admitted he received one letter and that the August 23, 1983, letter could have been it. This letter, to which a copy of the note was attached, demanded payment of interest and principal within ten days. Siouxland's attorney received a letter response from P.D. Furlong, counsel for Knight, dated August 30, 1983, asking for an extension on payment for 30 days. The behavior of Knight subsequent to January 1981 must be regarded as extremely odd for one who regarded his note as having been cancelled.

In view of its poor performance, the Company's slaughter division was shut down in November 1980, and its fabricating division was closed in July 1981. After July 1981, Siouxland remained open merely to collect accounts. It finally ceased all operations by October 1981. Knight remained in Siouxland's employ until October 15, 1981. After leaving Siouxland, he went to work for Land O'Lakes and remained with that company until December 1982. At trial, Knight testified that he was employed with Land O'Lakes when he read about Siouxland's October 1982 bankruptcy filing. From this, it can be concluded that Knight became aware of Siouxland's bankruptcy filing sometime between October and December 1982.

The balance remaining due on the note is $115,576.09 including interest from April 29, 1980, through September 11, 1985.

## CONCLUSIONS OF LAW

Resolution of this case turns not so much upon a discussion of the law but rather upon the facts themselves. Before discussing the merits, the Court first of all is presented with the question of whether Knight's Counterclaim, irrespective of its merits, must fail by operation of the Bankruptcy Code as well as the Iowa Statute of Limitations. This issue has to be considered in two aspects: first, as a claim against the estate and, secondarily, as a counterclaim to Siouxland's claim.

No proof of claim has ever been filed by Knight with respect to his claim ensconced in his present Counterclaim. The Notice and Order for meeting of creditors, issued and entered on November 19, 1982, provides that any creditor holding an unlisted claim and who desires to participate in the case or share in any distribution must file a proof of claim on or before the date the disclosure statement is approved. Siouxland's Disclosure Statement was approved on March 25, 1983.

Rule 3003(c) of the Rules of Bankruptcy Procedure mandates that any creditor whose claim is unscheduled shall file a proof of claim within the time fixed by the court; the failure being a bar to his sharing in any distribution. Knight's claim was unlisted, and hence he was obligated by a strict reading of Rule 3003 to file a proof of claim by March 25, 1983. Rule 3003, however, has been regarded by at least one court as constitutionally infirm insofar as it provides for no degree of assurance that a claimant be made aware of the manner in which the debtor has scheduled his claim and what he should do in the event the claim is not listed or listed as disputed, contingent or unliquidated. *In re Middle Plantation of Williamsburg, Inc.*, 36 B.R. 873 (Bankr.E.D.Va.1984); *see also In re Terex Corp.*, 45 B.R. 290 (Bankr.N.D.Ohio 1985). Bankruptcy Judge Bonney, in the *Williamsburg* case, pointed out that creditors have a right to assume that they will be accorded reasonable notice before their claim is barred by operation of Rule 3003(c). This Court agrees but must note that in the *Williamsburg* case, the debtor was *aware* of the claim and had listed it as disputed. In the case at bar, there are no facts in evidence to indicate Siouxland was even aware of Knight's claim until set out in the October 1983 Counterclaim. If a debtor is aware of a claim, regardless of its status, it of course has a legal obligation to schedule it. 11 U.S.C. § 521(1). Where, as here, a debtor has no knowledge of a claim, it can hardly be expected to include it in its list of creditors or provide notice to an unknown creditor. In such instance, all that can be done is to file the petition with as thorough a schedule of debts as possible. When this is done, and there are no facts to indicate that the debtor has knowingly failed to list a creditor, then the debtor has done all that should be done. If by happenstance there exists a person unknown to the debtor who has a claim, it is incumbent upon that person, once he becomes aware that bankruptcy proceedings have been initiated, to inquire further in an effort to determine whether his claim might be affected. The Ninth Circuit, in

the case of *Matter of Gregory*, 705 F.2d 1118 (9th Cir.1983), has said that when a holder of a large unsecured claim has notice enough to excite attention and put him on his guard such that further inquiry would be in order, that notice is "notice of everything to which such inquiry may have led." This is exactly the situation Knight finds himself in. Being intimate with Siouxland's financial condition, at least since 1979, he knew that its condition was extremely fragile. He also knew of the fact of the Chapter 11 filing almost contemporaneous with the act. Armed with this knowledge, he could not sit back and do nothing to make Siouxland aware of his claim in time for it to be scheduled. Rather, his was the responsibility to at least let Siouxland know in some fashion that he had a claim. He comes too late to the Court to argue that he should not be barred from filing a claim.

An order confirming a plan under Chapter 11 generally operates to discharge a debtor from claims that arose prior to the date of confirmation whether or not a proof of claim is filed. 11 U.S.C. § 1141(d)(1)(A)(i). The case-law-created exception is in the instance where the debtor knew of the creditor's claim but failed to provide the creditor notice of the Chapter 11 filing, and the creditor otherwise did not have actual knowledge of the filing in time to file a proof of claim. *In re Intaco Puerto Rico, Inc.*, 494 F.2d 94 (1st Cir. 1974); *In re American Properties, Inc.*, 30 B.R. 247 (Bankr.D.Kan.1983); *In re Sullivan Ford Sales, Inc.*, 25 B.R. 400 (Bankr. D.Me.1982). Knight does not come within this exception to section 1141(d) because he had actual knowledge of Siouxland's Chapter 11 filing long before the Plan was confirmed, and such knowledge should have prompted a claim being filed. His claim accordingly is discharged by operation of section 1141(d) irrespective of whether the Iowa Statute of Limitations has tolled. In any event, even taking into account the thirty-day extension granted by section 108(c), it appears that the statute of limitations for wages, vacation pay and bonus

expired in each instance before October 17, 1983, the date Knight commenced his Counterclaim. Expiration of a statute of limitations, however, does not preclude one from pleading a counterclaim as a defense of recoupment. Untimely counterclaims may be asserted on the theory of common law recoupment which survives as long as a plaintiff may assert a claim. This is true even though, as an independent counterclaim, it would be barred by an applicable statute of limitations. *City of Grand Rapids, Mich. v. McCurdy*, 136 F.2d 615 (6th Cir.1943). Advancing a counterclaim on the theory of recoupment does not, however, permit the defendant to seek nor obtain affirmative relief. It may be asserted only to the extent it defeats or diminishes the plaintiff's recovery. Recoupment is codified in Iowa by section 614.12 of the Iowa Code. This section permits a counterclaim to be pled as a defense but goes on to state that no judgment thereon, except for costs, can be rendered in favor of the person pleading. As noted in *Ramsvig v. Ersland*, 38 N.W.2d 127 (Iowa 1949), its purpose is to cover cases where parties are mutually indebted to each other so that one could not take advantage of the statute of limitations so as to bar the other. Thus, Knight may properly advance his claim for wages, vacation pay and bonus as a counterclaim, but recovery is restricted to recoupment to the extent Knight has proved his case.

■ The Court, after considering the evidence, must conclude that Knight has failed to prove his claim for wages. By his own admission, he has been paid for every week work.

■ Nor has he proven his claim for bonus, whether in the guise of a 40% cash bonus based upon the profits of the fabrication division or upon discharge of the note in exchange therefor. The facts of this case simply do not support his claim that an agreement for bonus was ever reached, that the fabrication division ever made a profit upon which a bonus could be based, or that his obligation on the note was ever discharged by oral agreement.

The facts do not support Knight's legal arguments based upon section 554.3601 of the Iowa Code (U.C.C. § 3–601).

■ The Defendants claim that Knight was discharged from liability on the note by virtue of an accord and satisfaction does not have merit either. An accord is an agreement to accept, in extinction of an obligation, something different from what was originally promised. Satisfaction is defined as acceptance by a creditor of the consideration of an accord resulting in extinguishment of the obligation. The essential element of an accord is assent or meeting of the minds. *Kellogg v. Iowa State Travelling Men's Association*, 239 Iowa 196, 29 N.W.2d 559 (Iowa 1947). The facts do not cause this Court to believe there was any agreement to discharge Knight's obligation. In his Brief, he suggests that he cannot be bound by comments of counsel contained in the August 30, 1983, letter suggesting that the letter was sent merely to ask for further time in which to discuss the facts surrounding the note. The language contained in the letter does not refer to any more discussion, rather it states: "Will you give us an extension on *payment* of the promissory note for 30 days?" While this letter may not constitute an admission by Knight, it is in its cumulative effect strongly suggestive of the fact that at least up until August 30, 1983, Knight recognized he had a remaining obligation on the note. The Court believes from the facts that Knight, at the July and September 1981 meetings, assured Siouxland that the note would be paid in January 1982 and that he never labored under any belief at that time that his obligation had been somehow discharged.

■ Finally, the facts do not establish Knight's claim to three weeks vacation pay per year. At best, Knight was entitled to one week vacation pay after one year of employment just as any other Siouxland employee was. Allowing Knight vacation pay for 1980 and 1981 would give him an allowed claim of $5,000.00.

Siouxland has proven its cause of action for recovery on the promissory note. The note of April 29, 1980, remains unpaid and has not been discharged either by agreement or accord and satisfaction. This case was commenced back on September 15, 1983, when the principal and interest were $92,871.64. Since then, additional interest has continued at the rate of 20½% per annum so that as of September 11, 1985, the balance due has mushroomed to $115,576.09. Knight asserts that it would now be inequitable to allow recovery on the note because of the long passage of time during which no demand for payment was made. The Court cannot accept this argument. Knight knew as long ago as July 1981 that the Company was expecting the note to be paid, and he led the Company to believe it would be paid in January 1982. He was initially aware of Siouxland's financial problems and was aware of its Chapter 11 filing. Had he bothered to inquire, he would have discovered that the note had been counted as an asset of the Company. Even as late as August 1983, he, through counsel, led Siouxland to believe the note would be paid 30 days hence. This case has been long in coming to trial, but Knight himself filed a Motion for continuance back in July 1985. His plea for equitable consideration must be denied.

Accordingly, judgment may be entered in favor of the Plaintiff, Siouxland Beef Processing Company, and against the Defendant, Bernard Knight, in the sum of $115,-576.09 less $5,000.00 recouped as vacation pay. The Defendant Bernard Knight's Counterclaim is DISMISSED except to the extent of $5,000.00 which is allowed as recoupment against the Plaintiff's Claim. Each party shall bear its own attorney fees, costs and expenses.

IT IS SO ORDERED.